UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

**CURTIS BEEBE**,

        Plaintiff,

vs.                                                     Case No. 8:05-cv-00805-SCB-EAJ

**ePARTNERS INCORPORATED**,
a Texas corporation,

        Defendant.
_____/

## ORDER

This cause comes before the Court on Defendant's Amended Motion for Summary Judgment as to Counts III and IV. (Doc. No. 34). Plaintiff opposes this motion. (Doc. No. 39). Also before the Court is Defendant's Motion for Leave to File Reply to Opposition of Plaintiff to Defendant's Motion for Summary Judgment. (Doc. No. 44).

**I.**    **Background**

Curtis Beebe ("Plaintiff") entered into an Employment Agreement with TexSYS Holding Corporation effective April, 2000. (Doc. No. 2 at 1). In July 2000, ePartners, Inc. ("Defendant") merged with TexSYS Holding Corporation. As part of the merger, Plaintiff became an employee of Defendant. At the time of the merger, Plaintiff was vice president of professional services and continued on in this capacity. (Doc. No. 36, Plaintiff's depo. at 23). Defendant is a computer software and support services business, which provides sales and services related to middle market business company software. Beginning in 2000 and continuing through 2001 and 2002, Defendant experienced an unexpected decline in the business software market. (Doc. No. 2 at

1

2).

In January 2003, Dan Duffy ("Duffy") became CEO of ePartners. In February 2003, while they were attending a Microsoft meeting in New Orleans, Duffy met with Defendant's key management employees and informed them that he wanted to institute employee incentive programs. (Doc. No. 34 at 2). Matt Purser, executive vice president of operations, explained that at the time Duffy took over as CEO of ePartners, the company was concerned that some executives might resign, and the company instituted the incentive programs to maintain continuity. (Doc. No. 36, Purser depo. at 90). On March 28, 2003, Duffy sent Plaintiff and other key management employees a follow up e-mail stating that the "Board" had signed off on the constructs of the incentive program plans, and "[t]he process of 'papering' the plans is now underway and will be completed as soon as possible." Duffy also stated that he would provide additional details to each executive. (Doc. No. 36, exhibit F).

In early May of 2003, Duffy sent a letter[1] (hereinafter referred to as the "Duffy Letter") to Plaintiff and other key executives outlining four different compensation plans: (1) 2003 Variable Incentive Plan, (2) 2003 Profitability Turn Incentive Plan, (3) Enterprise Value Bonus Plan, and (4) 2003 Executive Restricted Share Plan. (Doc. No. 36, exhibit H). The Duffy Letter explained that the letter would serve as the only documentation the executives needed to participate in the first two plans, and Plaintiff signed and returned the portions of the Duffy Letter that required his execution. However, as to the Enterprise Value Bonus Plan ("EVBP"), the plan at issue in this case, the Duffy Letter stated that "the Board of Directors has authorized management and the

---

[1] The letter was not dated, but parties agree that the letter was sent out sometime between May 2 and May 4, 2003.

Compensation Committee to formalize an Enterprise Value Bonus Plan that would pay amounts into a bonus pool for distribution to key leadership upon a qualified event (i.e. sale, merger, etc.)."  The Duffy Letter also stated that an attached spreadsheet outlined Plaintiff's "approximate payouts at various enterprise values," and that the "[a]ctual calculations are anticipated to be materially consistent with those outlined in the attached [spreadsheet]."  (Doc. No. 36, exhibit H).  The spreadsheet explained, for example, that at an enterprise value of $67,500,000.00, Plaintiff's payout would be approximately $142,018.00.  The Duffy Letter also stated that "[c]ompany counsel is in the process of drafting definitive documents for the Enterprise Value Bonus Plan . . . As soon as our counsel completes the drafting and the Board approves the final drafted documentation, you will receive executable documents for your records.  In the interim, please let this serve as your draft agreement." (Doc. No. 36, exhibit H).

In May 2003, Defendant hired outside counsel to begin drafting the EVBP.  (Doc. No. 37, Exhibit J, Christiansen depo. at 27, Purser depo. at 27).  The Compensation Committee, whose role it was to set compensation for Defendant's organization, negotiated with Duffy and Matt Purser ("Purser") about the content of the plan.  Duffy and Purser were then supposed to relay what had been agreed upon to the outside counsel to incorporate into the plan documents. (Doc. No. 36, Purser depo. at 28, 34).

The EVBP was renamed the Change of Control Plan.  Duffy stated that he used the term "Enterprise Value Bonus Plan" in the Duffy Letter because the incentive plan was being keyed off an enterprise value; however, he was told by corporate counsel that the plan was more appropriately called a change of control plan, since a change of control would have to occur for the incentive plan to take effect.  The Change of Control Plan was executed on May 20, 2004

3

and was retroactively effective as of February 13, 2003.  (Doc. NO. 37, Christiansen depo. at 49; Doc. No. 37, Exhibit L).

The Change of Control plan ("COC") applied to approximately twenty executives at ePartners.  (Doc. No. 36, Purser depo. at 52).  The COC plan set forth the terms of the incentive plan, and specifically explained under what conditions a merger or sale of the company would trigger a payout.  (Doc. No. 34 at 5).  According to the COC plan, a change of control did not occur if the company's stockholders held at least 50% of the voting power of the surviving or acquired corporation following a merger or consolidation.  (Doc. No. 37, exhibit L).  The payment that Plaintiff would receive upon a change of control under the COC plan was approximately half of the value that Plaintiff had anticipated receiving under the terms of the EVBP.  (Doc. No. 39 at 10).  Defendant claims that Plaintiff's anticipated allocations decreased, because Plaintiff's job title changed, and potential payouts were governed by job classification, not because of a difference in the plans.  (Doc. No. 34 at 5-6).

On July 6, 2004, Defendant and Ernst & Young Technology Group (EYT) merged, and the enterprise value of ePartners was in excess of $62,000,000.00.  (Doc. No. 39 at 8; Doc. No. 6 at 3).  As a result of the merger, Defendant's shareholders had 52% of the stock in the merged company compared with 48% for EYT shareholders.  (Doc. No. 36, Purser depo. at 82).  Therefore, Defendant remained in control of the merged company.

At the time of the merger, Plaintiff and other executives had not received the draft documents of the COC plan.  They only had the Duffy Letter which outlined the EVBP.  Therefore, after the EYT merger, Plaintiff, James Randall Russell, and Robert Bruce Steele, all executives with ePartners, inquired of Defendant if the EYT merger had triggered the EVBP.

(Doc. No. 39 at 8-9).

In September 2004, two months after the merger, Plaintiff asked Purser if the EYT merger was a triggering event.[2] Purser told Plaintiff that the EYT merger did not qualify as a triggering event, and Plaintiff would see the plan documents explaining the specifics of the finalized plan shortly, but the documentation had not been completed. (Doc. No. 36, Plaintiff's depo. at 70, 73). Plaintiff did not speak with anyone else about whether the EYT merger had triggered the EVBP until he was terminated in January 2005.

James Randell Russell, Defendant's senior vice president of operations, also inquired if the EYT merger triggered the EVBP. (Doc. No. 40, Russell depo. at 47). Russell asked Duffy about the effect of the EYT merger on the EVBP. Duffy told him that the EYT merger was not a triggering event. Duffy said that only a change of control after a merger would trigger the incentive plan. (Russell depo. at 50). Duffy explained to Russell that a change in control occurred if ePartners' stockholders had 50% or less of the stock in the company after the merger. Duffy also told Russell that the final plan documents explaining the specifics of the plan would be sent to him shortly, but that the final documents were still being drafted. (Doc. No. 40, Russell depo. at 75). Russell stated that he thought that Duffy's explanation of the change of control was different than what was represented in the Duffy Letter. (Doc. No. 40, Russell depo. at 50-51).

Robert Bruce Steele, Defendant's senior vice president of sales, said that he did not know if the EYT merger had triggered the EVBP, because the Duffy Letter was vague as to what

---

[2] The Court notes that the parties and the witness in this case use "qualifying event" and "triggering event" interchangeably.

would trigger the incentive plan. (Doc. No. 41, Steele depo. at 120). Steele asked for the finalized documents so he could see what would in fact trigger the bonus plan. Steele stated that the final plan documents had been completed before the merger and was informed that the documents would be forthcoming. (Doc. No. 41, Steele depo. at 121, 131-133).

On January 4, 2005, Duffy terminated Plaintiff's employment with Defendant. Plaintiff confronted Duffy at the termination conference and demanded payment under the EVBP. (Doc. No. 39 at 9). Duffy offered Plaintiff an enhanced severance package instead that included a complete release of any and all claims, including claims that Plaintiff might have under the incentive programs. Plaintiff did not agree to the severance package. (Doc. No. 39 at 9). Two weeks following Plaintiff's termination, Defendant sent him a letter with the COC plan documents enclosed. In January 2005, Defendant also sent all its executive copies of the COC plan documents for the first time. The COC plan specifically outlined that only a "change in control" would trigger a payout under the plan. (Doc. No. 39 at 10). Since the EYT merger did not result in a change of control, it was Defendant's position that a payout under the COC plan was not triggered. Plaintiff did receive $40,000.00 under the 2003 Profitability Turn Incentive plan, which had been outlined in the Duffy Letter. (Doc. No. 36, Plaintiff's depo. at 56, Jeneane Cremers[3] depo. at 45).

Plaintiff filed suit against Defendant in the Circuit Court of the Sixth Judicial Circuit in and For Pasco County, Florida. On April 27, 2005, Defendant removed this case to federal court. (Doc. No. 1). In his complaint, Plaintiff demands an Accounting and Damages, Count I;

---

[3] Jeneane Cremers is vice president of the human resources department for ePartner's. (Doc. 36, Cremers depo. at 7).

and alleges a Breach of the Employment Agreement, Count II; Breach of Enterprise Value Bonus Plan, Count III; and Fraud, Count IV. (Doc. No. 2). Defendant moves for summary judgment as to Counts III and IV only.

## II.     Standard of Review for a Motion to for Summary Judgment

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the initial burden of showing the Court, by reference to material on file, that there are no genuine issues of material fact that should be decided at trial. See Celotex Corp. v. Catrett, 477 U.S. 317 (1986). A moving party discharges its burden on a motion for summary judgment by "showing" or "pointing out" to the Court that there is an absence of evidence to support the non-moving party's case. Id. at 325. When a moving party has discharged its burden, the non-moving party must then "go beyond the pleadings," and by its own affidavits, or by "depositions, answers to interrogatories, and admissions on file," designate specific facts showing there is a genuine issue for trial. Id.

In determining whether the moving party has met its burden of establishing that there is no genuine issue as to any material fact and that it is entitled to judgment as a matter of law, the court must draw inferences from the evidence in the light most favorable to the non-movant and resolve all reasonable doubts in that party's favor. See Samples on behalf of Samples v. City of Atlanta, 846 F.2d 1328, 1330 (11th Cir. 1988). Thus, if a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact, then the court should not grant the summary judgment motion.

See Augusta Iron & Steel Works v. Employers Ins. of Wausau, 835 F.2d 855, 856 (11th Cir. 1988).

## III. Discussion

### A. Count III: Breach of Enterprise Value Bonus Plan

Under Florida law,[4] the elements of an action for breach of contract are: (1) a valid contract; (2) a material breach; and (3) damages. See Beck v. Lazard Freres & Co., LLC, 175 F.3d 913, 914 (11th Cir. 1999). To determine whether an enforceable contract exists, a court "must determine whether 'there has actually been a meeting of the minds of the parties upon definite terms and conditions which include the essential elements of a valid contract.'" Leopold v. Kimball Hill Homes Florida, Inc., 842 So.2d 133, 136 (Fla. 2d DCA 2003)(citation omitted). Furthermore, "[w]here essential terms of an agreement remain open, subject to future negotiation, there can be no enforceable contract." Suggs v. Defranco's Inc., 626 So.2d 1100, 1101 (Fla. 1st DCA 1993). Plaintiff alleges that Defendant breached the EVBP by failing to pay him a bonus when Defendant merged with EYT. Defendant argues that the Duffy Letter does not constitute a valid contract as to the EVBP, because there was no meeting of the minds as to definite terms and conditions. (Doc. No. 34 at 8).

Defendant argues that the non-committal language of the Duffy Letter demonstrates that it was merely a notification that the company was working on an incentive plan to be approved in the future, and was not a contractually binding agreement. (Doc. No. 34 at 9). Defendant points to the following language in the Duffy Letter to demonstrate that the letter is not an enforceable contact:

---

[4] Parties agree that Florida law applies.

  (1)  the Board of Directors has authorized management and the Compensation Committee to formalize an Enterprise Value Bonus Plan

  (2)  Company counsel is in the process of drafting definitive documents for the Enterprise Value Plan

  (3)  The attached Exhibit outlines your approximate payouts

  (4)  As noted, additional important Plan and Agreement documents will follow. As soon as counsel completes the drafting and the Board approves the final drafted documentation, you will receive executable documents for your records.

(Doc. No. 34 at 10).

  This Court agrees with Defendant that the Duffy Letter does not constitute a valid contract as to the EVBP. The letter clearly states that several events must occur before the EVBP is finalized: (1) management and the Compensation Committee must formalize a Bonus Plan; (2) counsel must complete the drafting of the definitive documents; and (3) the Board must approve final drafted documentation. (Doc. No. 36, exhibit H). When it is clear on the face of a document that certain actions must be taken before an agreement can be finalized, there is no enforceable contract. See <u>Irby v. Memorial Healthcare Group Inc.</u>, 901 So.2d 305, 306 (Fla. 1st DCA 2005)(holding that the letter contemplated future actions and was not an enforceable contract, because the letter stated "there are certain legal issues and other details that we must work through" and "hopefully, we can complete the practice evaluation and bring this agreement to substantial closure"). Furthermore, since the essential terms of the plan remained open and subject to future negotiation, there was no offer that Plaintiff could have accepted. See <u>Nichols v. Hartford Ins. Co. of the Midwest</u>, 834 So.2d 217, 219 (Fla. 1st DCA 2002)(stating that "an acceptance must contain an assent - or meeting of the minds - to the essential terms contained in the offer").

It is clear that essential terms of the EVBP remained open when the language describing the plans are compared. The Duffy Letter stated the letter would serve as the only required documentation as to the 2003 Profitability Turn Incentive Plan and 2003 Variable Incentive Plan. (Doc No. 36, exhibit H). However, as to the EVBP, the Duffy Letter stated it was merely a "draft agreement" and final documentation would only come after counsel had completed drafting the definitive documents and the Board had approved the final draft.

Plaintiff argues that pursuant to <u>Robbie v. City of Miami</u>, 469 So.2d 1384 (Fla. 1985) and Florida Statute § 672.305[5] (2004), a document may have indefinite terms and still be an enforceable contract. (Doc. No. 39 at 14). However, <u>Robbie</u> is factually distinguishable from this case and Florida Statute § 672.305 is not applicable. In <u>Robbie</u>, the parties had agreed to the essential terms of a settlement agreement[6] and disagreed as to one amended "Act of God" provision. The court held that the "Act of God" provision was not an essential element of the contract; therefore, a disagreement as to this one provision did not render the entire settlement agreement unenforceable. <u>Robbie</u>, 469 So.2d at 1385. In the case before this Court, the parties had not agreed to the essential terms of the EVBP. Furthermore, Plaintiff's reliance on Fla. Stat. § 672.305 is misplaced, because this statute is part of the uniform commercial code and applies only to contracts dealing with transactions for goods. <u>See</u> Fla. Stat. § 672.102

Plaintiff further argues that the executives' hard work was necessary to get Defendant

---

[5] Florida Statute § 672.305(1) states that "[t]he parties if they so intend can conclude a contract for sale even though the price is not settled. In such a case the price is a reasonable price at the time for delivery."

[6] Under Florida law, settlement agreements are governed by the rules of contract interpretation. <u>See</u> <u>Dorson v. Dorson</u>, 393 So.2d 632, 633 (Fla. 4th DCA 1981).

"out of the ditch," as Defendant was on the verge of bankruptcy, and courts are reluctant to hold contracts unenforceable on grounds of uncertainty when one party has received the benefits of the other party's performance. (Doc. No. 39 at 12). Plaintiff cites Blackhawk Heating & Plumbing Co. v. Data Lease Financial Corp., 302 So.2d 404 (Fla. 1974), and Burton v. Keaton, 60 So.2d 770 (Fla. 1952), in support. (Doc. No. 39 at 11-12). However, Blackhawk Heating and Burton are also factually distinguishable. In Blackhawk, the parties entered into an option agreement under which one party could purchase a large number of shares from the other party. The parties had agreed on the essential terms of the option agreement, and only disputed what the term "cash flow benefits" meant within the option agreement. The court held that "the agreement and the conduct of the parties clearly establishes the meaning of the term 'cash-flow benefit,'" and the disputed term would not render the entire option agreement unenforceable. 302 So.2d at 408. In the case before this Court, the parties had not agreed on the essential terms of the EVBP.

In Burton, the court held that an oral devise of one house on a lot that had two houses was valid even though there was not an exact demarcation line between the two properties. The court stated that a demarcation line could be discerned by the usage and custom of the property. Id. at 774. In the case before this Court, the terms of the Duffy Letter cannot be discerned by usage and custom, since the letter specifically stated that terms of the plan were not finalized and were still subject to corporate approval.

The EVBP as outlined in the Duffy Letter does not constitute an enforceable contract,

and therefore, Defendant's motion for summary judgment on Count III is granted.[7]

### B. Count IV: Fraud[8]

Plaintiff alleges that the Duffy Letter contained intentionally false misrepresentations on which the Defendant intended that Plaintiff would rely, and this constitutes fraud. (Doc. No. 2 at 7-8). The essential elements of common law fraud are: (1) a false statement of fact; (2) known by the defendant to be false at the time it was made; (3) made for the purpose of inducing the plaintiff to act in reliance thereon; (4) action by the plaintiff in reliance on the correctness of the representation; and (5) resulting damage to the plaintiff. Gandy v. TransWorld Computer Techonology Group, 787 So.2d 116, 118 (Fla. 2d DCA 2001).

#### 1. Present or Existing Facts

Generally, the fraud alleged must refer to a present or existing fact. See Perry v. Cosgrove, 464 So.2d 664, 666 (Fla. 2d DCA 1985). Plaintiff argues that the Duffy Letter misrepresented present or existing facts by stating that the "papering" or "drafting" of the bonus plan had already begun in May 2003, when it had not. (Doc. No. 39 at 14-15). Plaintiff received the Duffy Letter in May 2003, and Defendant's also counsel also received a request to begin drafting the document in May 2003. (Doc. No. 2 at 2; Doc. No. 37, Christiansen depo. at 27).

---

[7] As an additional ground for recovery, Plaintiff argues that his employment agreement stated that he would be provided with all employment documents, and he was not provided with the COC plan documents until after his termination. Therefore, Plaintiff argues that the terms of the Duffy Letter control. (Doc. No. 39 at 13-14). This argument is without merit. The fact that Plaintiff had not received the final documents of the COC plan does not transform the Duffy Letter into an enforceable contract.

[8] Since the Court finds that the Duffy Letter is not an enforceable contract, the Court need not address Defendant's argument that Plaintiff's claim of fraud is barred by the economic loss rule.

The beginning of the drafting process and the execution of the Duffy Letter occurred at essentially the same time. Therefore, the statement in the Duffy Letter that the drafting of the bonus plan had already begun does not constitute a false statement of existing fact.

        2.        Future Promises

Courts have recognized as fraudulent a false misrepresentation of fact where a defendant makes a promise to perform a material matter in the future that the defendant has no intention of performing. Virkler v. Herbert Enters., 403 F. Supp.2d 1141, 1150 (M.D. Fla. 2005)(citing Thor Bear, Inc. v. Crocker Mizner Park Inc., 648 So.2d 168, 172 (Fla. 4th DCA 1994)). In his complaint, Plaintiff alleges that Defendant made a promise to perform in the future that it had no intention of performing by: (1) intentionally misrepresenting to Plaintiff what the definition of a triggering event would be in the EVBP, and (2) intentionally misrepresenting to Plaintiff what his bonus payout would be. (Doc. No. 2 at 8). Defendant argues that the non-committal language as to final terms of the EVBP negate Plaintiff's claim that the Duffy Letter is fraudulent. (Doc. No. 34 at 13). The Court agrees.

As to Plaintiff's claim that Defendant misrepresented the definition of the triggering event, the Duffy Letter stated that Defendant "would pay amounts into a bonus pool for distribution to key leadership upon a qualified event (i.e., sale, merger, etc.)." However, the Duffy Letter also stated that the EVBP was still being drafted by corporate counsel, was still subject to Board approval, and the Board of Directors had only authorized management to formalize an Enterprise Value Bonus Plan. Since Defendant fully disclosed that the drafting of the plan was still in progress, the Duffy Letter's inclusion of a "merger" as a qualifying event did not guarantee that the Board would ultimately approve a payout under all types of mergers.

13

As to Plaintiff's claim that the Duffy Letter promised that the calculations of potential payouts would be materially consistent with the final plan, the Duffy Letter stated that "[t]he attached Exhibit outlines your *approximate* payouts . . . Actual calculations are *anticipated* to be materially consistent with those outlined in the attached Exhibit." (Doc. No. 36, exhibit H)(emphasis added). Furthermore, the Duffy Letter stated that "final determinations [of payouts] are subject to the proceeds allocation calculations approved by the Board of Directors." As written, the Duffy Letter did not promise that potential payouts would be the same when the plan was ultimately finalized. The Duffy Letter stated that it anticipated that the payouts would be consistent, but the payout figures were only approximate, and final determinations were still subject to approval by the Board of Directors. Such language does not constitute a fraudulent misrepresentation of fact. Therefore, the Court finds that Plaintiff has not shown that Defendant intentionally misrepresented the definition of the triggering event or what Plaintiff's payouts would be.

In his response to Defendant's motion for summary judgment, Plaintiff also argues that Defendant's delay in sending Plaintiff and other executives the final documents of the COC plan until after the merger calls into question Duffy's testimony that he intended to keep the promises that he made in the Duffy Letter. (Doc. No. 39 at 15). However, for the Duffy Letter to be fraudulent, Duffy had to know he was making a false statement of fact at the time he sent the letter. The Duffy Letter was sent out in May 2003 and states that the EVBP was still being drafted by counsel and was subject to Board approval. The COC plan, the finalized version of the EVBP, was finished in May 2004. The EYT merger occurred in July 2004. The fact that Plaintiff did not receive the COC plan documents until a few months after the EYT merger does

14

not show that Duffy knew at the time he sent the Duffy Letter that he had no intention of implementing the EVBP as set forth in Duffy Letter, especially since the Duffy Letter states that no plan had yet been finalized.

Plaintiff also argues that the Duffy Letter contains a fraudulent misrepresentation, because the COC plan does not provide payment to executives in cash, and this is contrary to the EVBP payout provision. (Doc. No. 39 at 9-10). This argument is without merit. Nowhere in the Duffy Letter does it state that Plaintiff's approximate payout would be made in cash. Therefore, Plaintiff has failed to show that Defendant intentionally made a false statement of fact, and Defendant's motion for summary judgment as to Count IV is granted.

### C. Sanctions

In his response to Defendant's motion for summary judgment, Plaintiff moves for sanctions against Defendant for failing to disclose information pursuant to Federal Rule of Civil Procedure 26. (Doc. No. 39 at 3-6). However, if Plaintiff wishes to move this Court for sanctions against Defendant for discovery violations, he must file a separate motion. See Federal Rule of Civil Procedure 7(b).

Accordingly, it is **ORDERED AND ADJUDGED** that:

1. Defendant's motion for Summary Judgment as to Counts III and IV (Doc. No. 34) is **GRANTED**;

2. Defendant's Motion for Leave to File Reply to Opposition of Plaintiff to Defendant's Motion for Summary Judgment (Doc. No. 44) is **GRANTED;**

3. To the extent that Plaintiff's response in opposition to Defendant's motion

for summary judgment moves this Court to impose sanctions against Defendant, the motion is **DENIED WITHOUT PREJUDICE**;

4. The clerk is directed to **STRIKE** Defendant's Reply to Plaintiff's Request for Sanctions Based on Alleged Discovery Violation. (Doc. No. 45).

**DONE AND ORDERED** at Tampa, Florida, this 26th day of April, 2006.

Copies to:
Counsel of Record

SUSAN C. BUCKLEW
United States District Judge